# MANDATE

## UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 7th of April, two thousand twenty-one.

Before:     Amalya L. Kearse,
            Dennis Jacobs,
            José A. Cabranes,
                    *Circuit Judges.*

_____

TZVI WEISS, LEIB WEISS, MALKE WEISS, YITZCHAK WEISS, YERUCHAIM WEISS, ESTHER DEUTSCH, MOSES STRAUSS, PHILIP STRAUSS, BLUMA STRAUSS, AHRON STRAUSS, ROISIE ENGELMAN, JOSEPH STRAUSS, MATANYA NATHANSEN, CHANA NATHANSEN, MATANYA AND CHANA NATHANSEN for THE ESTATE OF TEHILLA NATHANSEN, YEHUDIT NATHANSEN, S.N., a minor, HEZEKIEL TOPOROWITCH, PEARL B. TOPOROWITCH, YEHUDA TOPOROWITCH, DAVID TOPOROWITCH, SHAINA CHAVA NADEL, BLUMA ROM, RIVKA POLLACK, EUGENE GOLDSTEIN, LORRAINE GOLDSTEIN, BARBARA GOLDSTEIN INGARDIA, RICHARD GOLDSTEIN, MICHAEL GOLDSTEIN, CHANA FREEDMAN, MICHAL HONICKMAN for THE ESTATE OF HOWARD GOLDSTEIN, MICHAL HONICKMAN, DAVID GOLDSTEIN, HARRY LEONARD BEER AS EXECUTOR OF THE ESTATE OF ALAN BEER, HARRY LEONARD BEER, ANNA BEER, PHYLLIS MAISEL, ESTELLE CARROLL, SARRI ANNE SINGER, JUDITH SINGER, ERIC M. SINGER, ROBERT SINGER, JULIE AVERBACH for THE ESTATE OF STEVEN AVERBACH, JULIE AVERBACH, TAMIR AVERBACH, DEVIR AVERBACH, SEAN AVERBACH, A.A., a minor, MAIDA AVERBACH for THE ESTATE OF DAVID AVERBACH, MAIDA AVERBACH, MICHAEL AVERBACH, EILEEN SAPADIN, DANIEL ROZENSTEIN, JULIA ROZENSTEIN SCHON, ALEXANDER ROZENSTEIN, ESTHER ROZENSTEIN, JACOB STEINMETZ, DEBORAH STEINMETZ, JACOB STEINMETZ AND DEBORAH STEINMETZ for THE ESTATE OF AMICHAI STEINMETZ, NAVA STEINMETZ, ORIT MAYERSON, NATANEL STEINMETZ, ROBERT L. COULTER, SR. for THE ESTATE OF JANIS RUTH COULTER,

**JUDGEMENT**

Docket Nos. 19-863(L), 19-1159(XAP)

DIANNE COULTER MILLER, ROBERT L. COULTER, SR.,
ROBERT L. COULTER, JR., LARRY CARTER for THE
ESTATE OF DIANE LESLIE CARTER, LARRY CARTER,
SHAUN CHOFFEL, RICHARD BLUTSTEIN AND KATHERINE
BAKER for THE ESTATE OF BENJAMIN BLUTSTEIN,
RICHARD BLUTSTEIN, KATHERINE BAKER, REBEKAH
BLUTSTEIN, NEVENKA GRITZ for THE ESTATE OF DAVID
GRITZ, NEVENKA GRITZ, NEVENKA GRITZ for THE
ESTATE OF NORMAN GRITZ, JACQUELINE CHAMBERS AS
THE ADMINISTRATOR OF THE ESTATE OF ESTHER
BABLAR, JACQUELINE CHAMBERS, LEVANA COHEN, ELI
COHEN, SARAH ELYAKIM, YEHUDA AGABABA,
MENACHE AGABABA, YEHEZKEL AGABABA, GRETA
GELER, ILANA EROPA DORFMAN, REFAEL KITSIS AND
TOVA GUTTMAN AS THE ADMINISTRATOR OF THE
ESTATE OF HANNAH ROGEN, AKIVA ANACHOVICH,
JOSHUA FAUDEM, ZOHAR FATER, BRUCE MAZER, ORLY
ROM, RICHARD COFFEY, GAL GANZMAN, JUDITH
BUCHMAN-ZIV, ORA COHEN, MIRAV COHEN, DANIEL
COHEN, O.C., a minor, S.C., a minor, E.N.C., a minor, FAIGA
ZVIA LIEBERMAN, EINAT NOKED for THE ESTATE OF
EYAL NOKED, EINAT NOKED, A.N., a minor, AVISHAG
NOKED, BARUCH ZURI NOKED, BINYAMIN ELKANA
NOKED, NETA NECHAMA COHEN, T.N., a minor, KAREN
GOLDBERG, CHANA WEISS, ESTHER GOLDBERG,
YITZHAK GOLDBERG, SHOSHANA GOLDBERG, ELIEZER
GOLDBERG, Y.M.G., a minor, T.Y.G., a minor, NILLY
CHOMAN, TEMIMA SPETNER, JASON KIRSCHENBAUM,
ISABELLE KIRSCHENBAUM, ISABELLE KIRSCHENBAUM
for THE ESTATE OF MARTIN KIRSCHENBAUM, JOSHUA
KIRSCHENBAUM, SHOSHANA BURGETT, DAVID
KIRSCHENBAUM, DANIELLE TEITELBAUM, NETANEL
MILLER, CHAYA MILLER, ARIE MILLER, ALTEA
STEINHERZ, JONATHAN STEINHERZ, BARUCH YEHUDA
ZIV BRILL, CHAYA BEILI, AND GILA ALUF,

Plaintiffs-Appellants-Cross-Appellees,

- v. -

NATIONAL WESTMINSTER BANK, PLC.,

Defendant-Appellee-Cross-Appellant.

_____

THE ESTATE OF DAVID APPLEBAUM, THE ESTATE OF
NAAVA APPLEBAUM, DEBRA APPLEBAUM, THE ESTATE

OF JACQUELINE APPLEBAUM, NATAN APPLEBAUM,
SHIRA APPLEBAUM, YITZCHAK APPLEBAUM, SHAYNA
APPLEBAUM, TOVI BELLE APPLEBAUM, GEELA
APPLEBAUM GORDON, CHAYA TZIPORAH COHEN, PHILIP
LITLE, THE ESTATE OF ABIGAIL LITLE, ELISHUA LITLE,
HANNAH LITLE, HEIDI LITLE, JOSIAH LITLE, NOAH
LITLE, ARI HOROVITZ, BATSHEVA HOROVITZ SADAN,
DAVID HOROVITZ, THE ESTATE OF DEBRA RUTH
HOROVITZ, THE ESTATE OF ELI NATAN HOROVITZ, THE
ESTATE OF LEAH HOROVITZ, THE ESTATE MOSHE
HOROVITZ, NECHAMA HOROVITZ, SHULAMITE
HOROVITZ, TOVI HOROVITZ, TVI HOROVITZ, URI
HOROVITZ, BERNICE WOLF, BRYAN WOLF, STANLEY
WOLF, FRAN STRAUSS BAXTER, WILLIAM J. BAXTER,
ARIELA FREIRMARK, MENACHEM FREIRMARK,
HADASSAH FREIRMARK, PHYLLIS PAM, RIVKA REENA
PAM, SHOSHANA TITA, EZRA TITA, EPHRAIM TITA,
EPHRIAM TITA for THE ESTATE OF BERTIN TITA, RACHEL
POTOLSKI, OVADIA TOPPOROWITCH, YISRAEL
TOPPOROWITCH, YITZCHAK TOPPOROWITCH, MIRIAM
EHRENFELD, ROSE JOSEPH, LEIBEL REINITZ, MALVIA
REINITZ, MARGALI REINITZ, MENDY REINITZ, MIRIAM
REINITZ, RIVKA REINITZ, SAMUEL REINITZ, SHMUEL
REINITZ, YAKOV REINITZ, THE ESTATE OF MORDECHAI
REINITZ, THE ESTATE OF YISSOCHER DOV REINITZ,
YITZCHOK REINITZ, RAIZEL SHIMON, LEAH TAUBER,
HELEN WEIDER, AVROHOM D. RICHTER, BREINA
RICHTER, MIRIAM LEAH RICHTER, MOSHE RICHTER,
NECHAMA RICHTER, SARA MALKA RICHTER, SHLOMO
CHAIM RICHTER, TRANNE RICHTER, YAKOV YOSEF
RICHTER, YECHIEL RICHTER, YEHUDIS RICHTER,
YISROEL RICHTER, YITZCHOK RICHTER, PERL
BRAILOFSKY, MALKY BREUER, ESTER BUXBAUM,
GITTEL COHEN, CHAYA FREISEL, RACHEL ROSNER,
ELIZABETH SCHWARTZ, JACOB SCHWARTZ, MAX
SCHWARTZ, MICHAEL SCHWARTZ, PHILLIP SCHWARTZ,
ABRAHAM ZARKOWSKY, ARON ZARKOWSKY, BSHAVA
ZARKOWSKY RICHTER, THE ESTATE OF ELI
ZARKOWSKY, EZRIEL ZARKOWSKY, GITTEL
ZARKOWSKY, THE ESTATE OF GOLDIE ZARKOWSKY,
JOSEPH ZARKOWSKY, MENDEL ZARKOWSKY, MIRIAM
ZARKOWSKY, SHRAGE ZARKOWSKY, TRANY
ZARKOWSKY, YEHUDA ZARKOWSKY, ERIK SCHECTER,
SHLOMO TRATNER, THE ESTATE OF TIFERET TRATNER,
AVERHAM GROSSMAN, DEVORAH CHECHANOW LEIFER,
JOSEPH LEIFER, BRACHA MILSTEIN, SHIFRA MILLER,

CHAYA ROSENBERG, ABRAHAM WAXLER, ARTHUR
WAXLER, BARUCH WAXLER, CHANA WAXLER, DINA
WAXLER, EZEKIEL WAXLER, GEDALIA WAXLER, HAGGI
WAXLER, NACHUM WAXLER, OBADIAH WAXLER,
YAAKOV WAXLER, YOEL WAXLER, ZACHARIA WAXLER,
NETHANIEL BLUTH, MOSHE NAIMI, FAYE CHANA
BENJAMINSON, THE ESTATE OF MOSHE GOTTLIEB,
SEYMOUR GOTTLIEB, SHEILA GOTTLIEB,

Plaintiffs-Appellants-Cross-Appellees,

- v. -

NATIONAL WESTMINSTER BANK, PLC.,

Defendant-Appellee-Cross-Appellant.

_____

     The appeal and cross-appeal in the above captioned case from judgments of the United States District Court for the Eastern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

     IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgments of the district court are AFFIRMED, and the conditional cross-appeal is DISMISSED as moot.
.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

19-863(L)
Weiss v. National Westminster Bank PLC

| | |
|---|---|
| 1 | UNITED STATES COURT OF APPEALS |
| 2 | FOR THE SECOND CIRCUIT |
| 3 | - - - - - - |
| 4 | August Term, 2019 |
| 5 | (Argued: May 14, 2020          Decided: April 7, 2021) |
| 6 | Docket Nos. 19-863(L), 19-1159(XAP) |
| 7 | _____ |

8    TZVI WEISS, LEIB WEISS, MALKE WEISS, YITZCHAK WEISS,
9    YERUCHAIM WEISS, ESTHER DEUTSCH, MOSES STRAUSS, PHILIP
10   STRAUSS, BLUMA STRAUSS, AHRON STRAUSS, ROISIE ENGELMAN,
11   JOSEPH STRAUSS, MATANYA NATHANSEN, CHANA NATHANSEN,
12   MATANYA AND CHANA NATHANSEN for THE ESTATE OF TEHILLA
13   NATHANSEN, YEHUDIT NATHANSEN, S.N., a minor, HEZEKIEL
14   TOPOROWITCH, PEARL B. TOPOROWITCH, YEHUDA TOPOROWITCH,
15   DAVID TOPOROWITCH, SHAINA CHAVA NADEL, BLUMA ROM,
16   RIVKA POLLACK, EUGENE GOLDSTEIN, LORRAINE GOLDSTEIN,
17   BARBARA GOLDSTEIN INGARDIA, RICHARD GOLDSTEIN, MICHAEL
18   GOLDSTEIN, CHANA FREEDMAN, MICHAL HONICKMAN for THE
19   ESTATE OF HOWARD GOLDSTEIN, MICHAL HONICKMAN, DAVID
20   GOLDSTEIN, HARRY LEONARD BEER AS EXECUTOR OF THE ESTATE
21   OF ALAN BEER, HARRY LEONARD BEER, ANNA BEER, PHYLLIS
22   MAISEL, ESTELLE CARROLL, SARRI ANNE SINGER, JUDITH SINGER,
23   ERIC M. SINGER, ROBERT SINGER, JULIE AVERBACH for THE ESTATE
24   OF STEVEN AVERBACH, JULIE AVERBACH, TAMIR AVERBACH, DEVIR
25   AVERBACH, SEAN AVERBACH, A.A., a minor, MAIDA AVERBACH for
26   THE ESTATE OF DAVID AVERBACH, MAIDA AVERBACH, MICHAEL

1   AVERBACH, EILEEN SAPADIN, DANIEL ROZENSTEIN, JULIA
2   ROZENSTEIN SCHON, ALEXANDER ROZENSTEIN, ESTHER
3   ROZENSTEIN, JACOB STEINMETZ, DEBORAH STEINMETZ, JACOB
4   STEINMETZ AND DEBORAH STEINMETZ for THE ESTATE OF
5   AMICHAI STEINMETZ, NAVA STEINMETZ, ORIT MAYERSON,
6   NATANEL STEINMETZ, ROBERT L. COULTER, SR. for THE ESTATE OF
7   JANIS RUTH COULTER, DIANNE COULTER MILLER, ROBERT L.
8   COULTER, SR., ROBERT L. COULTER, JR., LARRY CARTER for THE
9   ESTATE OF DIANE LESLIE CARTER, LARRY CARTER, SHAUN
10  CHOFFEL, RICHARD BLUTSTEIN AND KATHERINE BAKER for THE
11  ESTATE OF BENJAMIN BLUTSTEIN, RICHARD BLUTSTEIN,
12  KATHERINE BAKER, REBEKAH BLUTSTEIN, NEVENKA GRITZ for THE
13  ESTATE OF DAVID GRITZ, NEVENKA GRITZ, NEVENKA GRITZ for THE
14  ESTATE OF NORMAN GRITZ, JACQUELINE CHAMBERS AS THE
15  ADMINISTRATOR OF THE ESTATE OF ESTHER BABLAR, JACQUELINE
16  CHAMBERS, LEVANA COHEN, ELI COHEN, SARAH ELYAKIM,
17  YEHUDA AGABABA, MENACHE AGABABA, YEHEZKEL AGABABA,
18  GRETA GELER, ILANA EROPA DORFMAN, REFAEL KITSIS AND TOVA
19  GUTTMAN AS THE ADMINISTRATOR OF THE ESTATE OF HANNAH
20  ROGEN, AKIVA ANACHOVICH, JOSHUA FAUDEM, ZOHAR FATER,
21  BRUCE MAZER, ORLY ROM, RICHARD COFFEY, GAL GANZMAN,
22  JUDITH BUCHMAN-ZIV, ORA COHEN, MIRAV COHEN, DANIEL
23  COHEN, O.C., a minor, S.C., a minor, E.N.C., a minor, FAIGA ZVIA
24  LIEBERMAN, EINAT NOKED for THE ESTATE OF EYAL NOKED, EINAT
25  NOKED, A.N., a minor, AVISHAG NOKED, BARUCH ZURI NOKED,
26  BINYAMIN ELKANA NOKED, NETA NECHAMA COHEN, T.N., a minor,
27  KAREN GOLDBERG, CHANA WEISS, ESTHER GOLDBERG, YITZHAK
28  GOLDBERG, SHOSHANA GOLDBERG, ELIEZER GOLDBERG, Y.M.G., a
29  minor, T.Y.G., a minor, NILLY CHOMAN, TEMIMA SPETNER, JASON
30  KIRSCHENBAUM, ISABELLE KIRSCHENBAUM, ISABELLE
31  KIRSCHENBAUM for THE ESTATE OF MARTIN KIRSCHENBAUM,
32  JOSHUA KIRSCHENBAUM, SHOSHANA BURGETT, DAVID
33  KIRSCHENBAUM, DANIELLE TEITELBAUM, NETANEL MILLER,
34  CHAYA MILLER, ARIE MILLER, ALTEA STEINHERZ, JONATHAN

1  STEINHERZ, BARUCH YEHUDA ZIV BRILL, CHAYA BEILI, AND GILA
2  ALUF,

3  *Plaintiffs-Appellants-Cross-Appellees*,

4
5  - v. -

6  NATIONAL WESTMINSTER BANK, PLC.,

7  *Defendant-Appellee-Cross-Appellant.*
8  _____

9   THE ESTATE OF DAVID APPLEBAUM, THE ESTATE OF NAAVA
10  APPLEBAUM, DEBRA APPLEBAUM, THE ESTATE OF JACQUELINE
11  APPLEBAUM, NATAN APPLEBAUM, SHIRA APPLEBAUM, YITZCHAK
12  APPLEBAUM, SHAYNA APPLEBAUM, TOVI BELLE APPLEBAUM,
13  GEELA APPLEBAUM GORDON, CHAYA TZIPORAH COHEN, PHILIP
14  LITLE, THE ESTATE OF ABIGAIL LITLE, ELISHUA LITLE, HANNAH
15  LITLE, HEIDI LITLE, JOSIAH LITLE, NOAH LITLE, ARI HOROVITZ,
16  BATSHEVA HOROVITZ SADAN, DAVID HOROVITZ, THE ESTATE OF
17  DEBRA RUTH HOROVITZ, THE ESTATE OF ELI NATAN HOROVITZ,
18  THE ESTATE OF LEAH HOROVITZ, THE ESTATE MOSHE HOROVITZ,
19  NECHAMA HOROVITZ, SHULAMITE HOROVITZ, TOVI HOROVITZ,
20  TVI HOROVITZ, URI HOROVITZ, BERNICE WOLF, BRYAN WOLF,
21  STANLEY WOLF, FRAN STRAUSS BAXTER, WILLIAM J. BAXTER,
22  ARIELA FREIRMARK, MENACHEM FREIRMARK, HADASSAH
23  FREIRMARK, PHYLLIS PAM, RIVKA REENA PAM, SHOSHANA TITA,
24  EZRA TITA, EPHRAIM TITA, EPHRIAM TITA for THE ESTATE OF
25  BERTIN TITA, RACHEL POTOLSKI, OVADIA TOPPOROWITCH,
26  YISRAEL TOPPOROWITCH, YITZCHAK TOPPOROWITCH, MIRIAM
27  EHRENFELD, ROSE JOSEPH, LEIBEL REINITZ, MALVIA REINITZ,
28  MARGALI REINITZ, MENDY REINITZ, MIRIAM REINITZ, RIVKA
29  REINITZ, SAMUEL REINITZ, SHMUEL REINITZ, YAKOV REINITZ, THE
30  ESTATE OF MORDECHAI REINITZ, THE ESTATE OF YISSOCHER DOV
31  REINITZ, YITZCHOK REINITZ, RAIZEL SHIMON, LEAH TAUBER,

1   HELEN WEIDER, AVROHOM D. RICHTER, BREINA RICHTER, MIRIAM
2   LEAH RICHTER, MOSHE RICHTER, NECHAMA RICHTER, SARA
3   MALKA RICHTER, SHLOMO CHAIM RICHTER, TRANNE RICHTER,
4   YAKOV YOSEF RICHTER, YECHIEL RICHTER, YEHUDIS RICHTER,
5   YISROEL RICHTER, YITZCHOK RICHTER, PERL BRAILOFSKY, MALKY
6   BREUER, ESTER BUXBAUM, GITTEL COHEN, CHAYA FREISEL,
7   RACHEL ROSNER, ELIZABETH SCHWARTZ, JACOB SCHWARTZ, MAX
8   SCHWARTZ, MICHAEL SCHWARTZ, PHILLIP SCHWARTZ, ABRAHAM
9   ZARKOWSKY, ARON ZARKOWSKY, BSHAVA ZARKOWSKY RICHTER,
10  THE ESTATE OF ELI ZARKOWSKY, EZRIEL ZARKOWSKY, GITTEL
11  ZARKOWSKY, THE ESTATE OF GOLDIE ZARKOWSKY, JOSEPH
12  ZARKOWSKY, MENDEL ZARKOWSKY, MIRIAM ZARKOWSKY,
13  SHRAGE ZARKOWSKY, TRANY ZARKOWSKY, YEHUDA ZARKOWSKY,
14  ERIK SCHECTER, SHLOMO TRATNER, THE ESTATE OF TIFERET
15  TRATNER, AVERHAM GROSSMAN, DEVORAH CHECHANOW LEIFER,
16  JOSEPH LEIFER, BRACHA MILSTEIN, SHIFRA MILLER, CHAYA
17  ROSENBERG, ABRAHAM WAXLER, ARTHUR WAXLER, BARUCH
18  WAXLER, CHANA WAXLER, DINA WAXLER, EZEKIEL WAXLER,
19  GEDALIA WAXLER, HAGGI WAXLER, NACHUM WAXLER, OBADIAH
20  WAXLER, YAAKOV WAXLER, YOEL WAXLER, ZACHARIA WAXLER,
21  NETHANIEL BLUTH, MOSHE NAIMI, FAYE CHANA BENJAMINSON,
22  THE ESTATE OF MOSHE GOTTLIEB, SEYMOUR GOTTLIEB, SHEILA
23  GOTTLIEB,

24                          *Plaintiffs-Appellants-Cross-Appellees*,

25
26                                    - v. -

27  NATIONAL WESTMINSTER BANK, PLC.,

28                          *Defendant-Appellee-Cross-Appellant.**
29  _____

---

\*      The Clerk of the Court is directed to amend the official caption to conform with the above
captions of the two cases, which were consolidated for pretrial proceedings in the district
court.

-4-

1    Before:  KEARSE, JACOBS, and CABRANES, *Circuit Judges*.

2            Joint appeal from judgments entered on March 31, 2019, in the United

3    States District Court for the Eastern District of New York, Dora L. Irizarry, then-*Chief*

4    *Judge*, (A) dismissing the operative amended complaints in these two actions that seek

5    to hold defendant bank liable under the Antiterrorism Act of 1990 ("ATA"), *see* 18

6    U.S.C. §§ 2333(a), 2331(1), and 2339B, for providing banking services to a charitable

7    organization with alleged ties to Hamas, a designated Foreign Terrorist Organization

8    ("FTO") alleged to have committed a series of terrorist attacks in Israel in 2001-2004;

9    and (B) denying leave to amend the complaints to allege aiding-and-abetting claims

10   under the Justice Against Sponsors of Terrorism Act ("JASTA"), *see* 18 U.S.C.

11   § 2333(d).  The district court granted summary judgment dismissing the ATA claims

12   in light of this Court's decision in *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018),

13   on the ground that plaintiffs failed to adduce sufficient evidence that the bank itself

14   committed an act of international terrorism within the meaning of §§ 2333(a) and

15   2331(1); it denied leave to amend on the ground that amendment asserting JASTA

16   claims would be futile because plaintiffs did not point to evidence sufficient to

17   support an inference that the bank had the requisite awareness that it was aiding and

18   abetting the violent or life-endangering activities of the FTO Hamas.  *See Weiss v.*

1    *National Westminster Bank PLC*, 381 F.Supp.3d 223 (2019).   On appeal, plaintiffs

2    contend principally that the district court misapplied *Linde* and imposed unduly

3    stringent standards (a) in requiring that the material support provided by the bank

4    be traceable to the attacks on plaintiffs in order to hold the bank liable as a principal

5    for the attacks, and (b) in concluding that plaintiffs' evidence of the bank's violation

6    of § 2339B was insufficient to permit an inference that the bank was generally aware

7    that it was playing a role in terrorism by Hamas, as required to make the bank liable

8    as an aider and abetter.

9            Cross-appeal by defendant requesting, in the event the judgments are not

10    to be affirmed, that we reverse the district court's denial of defendant's motion to

11    dismiss the actions for lack of personal jurisdiction.

12            Concluding that the district court properly assessed the record and

13    applied the principles articulated in *Linde*, we affirm the judgments.   Defendant's

14    conditional cross-appeal is dismissed as moot.

15            Judgment affirmed; cross-appeal dismissed.

16            PETER RAVEN-HANSEN, Hackensack, New Jersey (Gary M.
17                   Osen, Ari Ungar, Michael Radine, Aaron Schlanger, Osen,
18                   Hackensack, New Jersey; Steven M. Steingard, Stephen H.
19                   Schwartz, Kohn, Swift & Graf, Philadelphia, Pennsylvania;
20                   Shawn P. Naunton, Zuckerman Spaeder, New York, New
21                   York; C. Tab Turner, Turner & Associates, North Little

1   Rock, Arkansas, on the brief), *for Plaintiffs-Appellants-Cross-*
2   *Appellees in Weiss v. National Westminster Bank, PLC.*

3   FLEISCHMAN BONNER & ROCCO, New York, New York
4   (James P. Bonner, Patrick L. Rocco, Susan M. Davies, New
5   York, New York, of counsel; Richard D. Heideman, Noel J.
6   Nudelman, Tracy R. Kalik, Heideman Nudelman & Kalik,
7   Washington, D.C., of counsel), *for Plaintiffs-Appellants-Cross-*
8   *Appellees in Applebaum v. National Westminster Bank, PLC.*

9   JONATHAN I. BLACKMAN, New York, New York (Mark E.
10   McDonald, Katherine R. Lynch, Rathna Ramamurthi, New
11   York, New York, Cleary Gottlieb Steen & Hamilton, on the
12   brief), *for Defendant-Appellee-Cross-Appellant.*

13   MAYER BROWN, Washington D.C. (Andrew J. Pincus, Alex C.
14   Lakatos, Marc R. Cohen, of counsel), *filed a brief for Amici*
15   *Curiae Institute of International Bankers and European Banking*
16   *Federation, in support of Defendant-Appellee-Cross-Appellant.*

1    KEARSE, Circuit Judge.

2          Plaintiffs Tzvi Weiss, *et al.*, United States citizens who were, or represent,

3    victims of more than a dozen alleged Hamas terrorist attacks in Israel in 2001-2004,

4    appeal from judgments entered on March 31, 2019, in the United States District Court

5    for the Eastern District of New York, Dora L. Irizarry, *Chief Judge*, (A) dismissing their

6    amended complaints in these two actions seeking to recover damages under the

7    Antiterrorism Act of 1990 ("ATA"), *see* 18 U.S.C. §§ 2333(a), 2331(1), and 2339B,

8    against defendant National Westminster Bank PLC ("NatWest" or the "Bank") for

9    providing banking services to a charitable organization that allegedly had ties to

10   Hamas; and (B) denying leave to amend the complaints to allege aiding-and-abetting

11   claims against the Bank under the Justice Against Sponsors of Terrorism Act

12   ("JASTA"), *see id*. § 2333(d).  The district court, in light of this Court's decision in *Linde*

13   *v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) ("*Linde*"), granted summary judgment

14   dismissing plaintiffs' claims under §§ 2333(a), 2331(1), and 2339B on the ground that

15   plaintiffs failed to adduce sufficient evidence to hold the Bank liable as a principal for

16   acts of international terrorism; the court denied plaintiffs' motion for leave to amend

17   the complaints, concluding that amendment asserting JASTA aiding-and-abetting

18   claims would be futile because plaintiffs did not point to evidence sufficient to

1    support an inference that NatWest had the requisite knowledge--*i.e.,* at least a general

2    awareness--that it played a role in Hamas's alleged violent or life-endangering

3    activities.  On appeal, plaintiffs contend principally that the district court misapplied

4    *Linde* and (a) unduly credited evidence proffered by NatWest and imposed unduly

5    stringent standards in requiring that the Bank's provision of banking services be

6    traceable to specific terrorist attacks in order to make the Bank liable for the attacks

7    as a principal, and (b) erred in concluding that plaintiffs' evidence of NatWest's

8    violation of § 2339B was insufficient to permit an inference that the Bank was

9    generally aware that it was playing a role in terrorism.

10   NatWest, while urging affirmance of the dismissals, cross-appeals to

11   contend that if we do not affirm, we should reverse the district court's denial of

12   NatWest's motion to dismiss these actions for lack of personal jurisdiction.

13   For the reasons that follow, we conclude that summary judgment was

14   properly granted and that leave to amend the complaints was properly denied.  We

15   thus affirm the judgments, and we dismiss the cross-appeal as moot.

1        I. BACKGROUND

2              The first of these two actions was commenced in 2005 under the ATA by

3        the Weiss plaintiffs against NatWest (the "*Weiss* action") following numerous terrorist

4        attacks in Israel between March 27, 2002, and September 24, 2004.  The Applebaum

5        plaintiffs commenced their ATA action against NatWest in 2007 (the "*Applebaum*

6        action"), and the two cases were soon consolidated for pretrial proceedings.

7              NatWest is a financial institution incorporated and headquartered in the

8        United Kingdom.  From at least 1994 to 2007, NatWest provided banking services to

9        the Palestine Relief & Development Fund, commonly known as "Interpal."  Interpal

10       is a London-based nonprofit entity founded in 1994 and registered with the United

11       Kingdom's Charity Commission for England & Wales ("UK Regulatory Authorities").

12             Hamas has been officially designated a Foreign Terrorist Organization

13       ("FTO") by the United States since 1997.  In August 2003, the United States officially

14       designated Interpal a Specially Designated Global Terrorist ("SDGT") based on reports

15       that it was operated as a major fundraiser for Hamas.  Plaintiffs contend that NatWest

16       provided material support to Interpal between 1996 and 2003 by processing at least

17       457 wire transfers of funds from Interpal to 13 charities that NatWest allegedly knew,

1    or willfully ignored, were controlled by, or were alter egos of, Hamas (the "13

2    Charities"). "It is undisputed that each of the attacks by which Plaintiffs were injured

3    was 'an act of international terrorism'" within the meaning of 18 U.S.C. §§ 2333(a) and

4    2331(1). (NatWest brief on appeal at 4.)

5    A. *The Course of This Litigation*

6            The procedural history of the present actions has been tracked through

7    several opinions of the district court and this Court, including the following,

8    familiarity with which is assumed. *See Weiss v. National Westminster Bank PLC*, 453

9    F.Supp.2d 609 (E.D.N.Y. 2006) ("*Weiss I*"); *Weiss v. National Westminster Bank PLC*, 936

10   F.Supp.2d 100 (E.D.N.Y. 2013) ("*Weiss II*"), *vacated and remanded by Weiss v. National*

11   *Westminster Bank PLC*, 768 F.3d 202 (2d Cir. 2014) ("*Weiss III*"); *Weiss v. National*

12   *Westminster Bank PLC*, 278 F.Supp.3d 636 (E.D.N.Y. 2017) ("*Weiss IV*"); and *Weiss v.*

13   *National Westminster Bank PLC*, 381 F.Supp.3d 223 (E.D.N.Y. 2019) ("*Weiss V*").

14           The original complaint in the *Weiss* action alleged that NatWest aided

15   and abetted the murder or attempted murder of, or physical violence to, United States

16   citizens in violation of 18 U.S.C. §§ 2332(a), 2332(b), 2332(c), and 2333(a), and that as

17   a principal it committed acts of international terrorism in violation of 18 U.S.C.

-11-

1    §§ 2339B(a)(1) and 2333(a).  In 2006, the aiding-and-abetting causes of action were

2    dismissed, without prejudice, for failure to state a claim.  *See Weiss I*, 453 F.Supp.2d

3    at 622.  The plaintiffs in the *Applebaum* action, whose original complaint also included

4    aiding-and-abetting claims, thereafter agreed to the dismissal of those claims without

5    prejudice.

6            In 2013, the district court granted a motion by NatWest for summary

7    judgment ("First Summary Judgment Motion") dismissing the actions.  The court

8    found that plaintiffs could not show that NatWest acted with the requisite scienter to

9    support their claims.  *See Weiss II*, 936 F.Supp.2d at 114.  In 2014, this Court vacated

10   the judgments, concluding that plaintiffs had proffered evidence "sufficient to create

11   a triable issue of fact as to whether NatWest's knowledge and behavior in response

12   satisfied the statutory scienter requirements."  *Weiss III*, 768 F.3d at 212.   We

13   remanded for further proceedings, including consideration of other grounds asserted

14   by NatWest in its motion for summary judgment.

15           In June 2016, plaintiffs filed their present complaints--an amended

16   *Applebaum* action complaint and the sixth amended *Weiss* action complaint--adding

17   claims arising from three additional attacks.  NatWest promptly moved for summary

18   judgment dismissing the new claims and renewed its motion for summary judgment

-12-

1    on grounds the district court had not reached in *Weiss II*.  In September 2017, in

2    *Weiss IV*, the district court granted the motion in part, but found there were triable

3    issues of fact with respect to 16 of the 18 alleged attacks.  *See Weiss IV*, 278 F.Supp.3d

4    at 650.

5                In September 2016, in the interim between plaintiffs' filing of the current

6    complaints and the district court's decision in *Weiss IV*, the ATA was amended by the

7    enactment of JASTA to provide that a civil ATA action under § 2333(a) may be

8    maintained on theories of aiding and abetting or conspiracy.  *See* 18 U.S.C. § 2333(d).

9    Congress made JASTA retroactively applicable to actions such as these (*see* Part II.B.

10   below).

11                A few months after the decision in *Weiss IV*, this Court decided *Linde*, an

12   appeal from an ATA judgment in favor of the *Linde* plaintiffs after a jury trial.  The

13   jury had been instructed that if it found that the defendant, Arab Bank PLC ("Arab

14   Bank"), provided material support to Hamas in violation of § 2339B--which makes it

15   a crime to knowingly provide, or attempt or conspire to provide, material support or

16   resources to an FTO--that finding was sufficient to establish Arab Bank's own

17   commission of an act of international terrorism under § 2333(a).  As discussed further

18   in Part II.A. below, we vacated the judgment, concluding that that instruction was

1    erroneous because a bank's provision of material support to a known terrorist

2    organization is not, by itself, sufficient to establish the bank's liability under the ATA.

3    *See Linde*, 882 F.3d at 326.  Rather, in order to satisfy the ATA's requirements for civil

4    liability as a principal, the "defendant's act must," *inter alia*, "*also* involve violence or

5    endanger human life.  *See* [18 U.S.C.] § 2331(1)(A).  Further, the act must appear to be

6    intended to intimidate or coerce a civilian population or to influence or affect a

7    government.  *See id*. § 2331(1)(B)."  *Linde*, 882 F.3d at 326 (emphasis in original).

8           In addition, *Linde* noted that in order to hold a defendant liable for an

9    ATA violation on a JASTA theory of aiding and abetting, a plaintiff must show that

10   the entity the defendant aided--*i.e.*, the principal--performed a wrongful act that

11   caused an injury, that the defendant must have been "generally aware of his role as

12   part of an overall illegal or tortious activity at the time that he provide[d] the

13   assistance," and that "the defendant must [have] knowingly and substantially

14   assist[ed] the principal violation."  *Id*. at 329 (internal quotation marks omitted).

15   B.  *NatWest's Renewed Summary Judgment Motion Based on* Linde

16          In the wake of *Linde*, NatWest sought and received permission to file

17   another renewed motion for summary judgment ("2018 Summary Judgment Motion").

-14-

1    NatWest contended that plaintiffs could not adduce evidence sufficient to permit an

2    inference that its financial services of transmitting Interpal moneys to the 13 Charities

3    involved violence, or endangered human life, or appeared to be intended to

4    intimidate or coerce a civilian population or to influence or affect a government.

5         In support of its 2018 Summary Judgment Motion, NatWest cited, *inter*

6    *alia*, facts that were undisputed as revealed in statements that had been submitted by

7    the parties pursuant to Local Rule 56.1 ("Rule 56.1 Statement" or "Rule 56.1 Response")

8    in connection with the Bank's First Summary Judgment Motion; and it submitted a

9    Rule 56.1 Supplemental Statement as to additional facts it asserted were undisputed.

10   NatWest's Rule 56.1 Supplemental Statement principally quoted Interpal documents

11   and quoted declarations or deposition testimony of the Bank's managerial employees

12   as to the policies and practices of NatWest and their institutional knowledge of the

13   operations and affairs of Interpal.  It included the following assertions.

14        In 1998, NatWest's Relationship Manager for the accounts of Interpal

15   "completed a customer appraisal form for Interpal describing it as an organization

16   that '[p]rovides charitable relief' in Palestine and Lebanon, usually involving 'food or

17   allowances for children's education.'  The form further noted [Interpal's statement]

18   that the '[t]wo major times of the year for receipts are Ramadan . . . and at Easter

-15-

1    time.'" (NatWest Rule 56.1 Supplemental Statement ¶ 1.)  Plaintiffs' response to this

2    was as follows:

3              RESPONSE:  Admit the quoted statements were made, but
4              note that the Second Circuit has expressly held that:

5                   The requirement to "appear to be intended . . ." does
6              not depend on the actor's beliefs, but imposes on the actor
7              an objective standard to recognize the apparent intentions
8              of actions.  *Cf. Boim v. Holy Land Found. for Relief and Dev.*,
9              549 F.3d 685, 693-94 (7th Cir. 2008) (en banc) (Posner, *J.*)
10             (describing the appearance-of-intention requirement "not
11             [as] a state-of-mind requirement" and stating that "it is a
12             matter of external appearance rather than subjective intent
13             . . . .").

14             *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 (2d Cir.
15             2014).  Therefore, the customer appraisal form for Interpal is
16             irrelevant to the subject of the pending motion.  The "external
17             appearance" relevant to 18 U.S.C. § 2331 is not the "external
18             appearance" presented by a terrorist group or its funders.  If that
19             were the case, Hamas's description of its terror campaign as
20             "legitimate resistance to occupation" would itself nullify the ATA.
21             Instead, the question for the jury is whether the Defendant's
22             conduct presents the "external appearance."  That is to be
23             determined by assessing the Bank's culpability in contributing to
24             the acts of terrorism at issue.

25   (Plaintiffs' Response to Rule 56.1 Supplemental Statement ¶ 1) (Plaintiffs' "External

26   Appearance Caveat").

27             NatWest's proffer of supplemental facts it believed to be undisputed also

28   included the following:  NatWest's internal inquiries in 2002 with regard to "'details

-16-

1    of the most recent due diligence undertaken in respect of the Bank's knowledge of

2    dealings in [Interpal's] US$ account,'" and Interpal's characterizations of its charitable

3    operations (NatWest Rule 56.1 Supplemental Statement ¶¶ 2-3); a 2003 record from

4    UK Regulatory Authorities--which NatWest maintained in its files--listing among

5    Interpal's objectives "the provision of aid and assistance, support[,] guidance[,] and

6    comfort to poor[,] needy[,] sick children and widows" (*id.* ¶ 4); and Interpal annual

7    reports for 1999-2003 (also maintained in NatWest's files) detailing Interpal's

8    spending allocations--a planned 5% for fundraising, 5% for administration, and 10%

9    for future distribution, and actual yearly expenditures of 87.3% to 94.7% directly on

10   charitable projects (*id.* ¶ 5).  NatWest also asserted that "[b]etween November 8, 1996

11   and September 25, 2003, at the request of its customer Interpal, NatWest processed

12   457 wire transfers (the 'Relevant Transfers') to the 13 charities that plaintiffs contend

13   are alter egos of or controlled by Hamas," and that the "stated purposes for these

14   transfers included" programs for orphans, a maternity clinic, student aid, emergency

15   medical aid, food parcels, winter clothes, and other community projects (*id.* ¶ 7); that

16   Interpal on its website stated that it felt an obligation "'to ensure that the funds' it

17   received were 'used for charitable purposes as specified,'" "stated that it allowed

18   transfers only to 'bona fide organisations,'" and stated that it insisted on--and sent

-17-

1  delegations to verify--the charities' adherence to "'the proper charitable use of funds

2  as specified'" (*id*. ¶¶ 9-12); and that "[n]one of the Relevant Transfers was identified

3  as being for any violent or terroristic purpose" (*id*. ¶ 8).

4     As to each of these NatWest Rule 56.1 Supplemental Statements other

5  than ¶¶ 7 and 8, plaintiffs' response was to state that they "[a]dmit[ted]" that the

6  statement described was made by the speaker cited or was contained in the document

7  cited, but to incorporate by reference their (above quoted) External Appearance

8  Caveat.  Plaintiffs gave a qualified response to ¶ 7 by admitting that there were "*at*

9  *least*" 457 wire transfers, and by asserting that the transfers were "for Hamas" and

10  totaled approximately $12,000,000; and as to ¶ 8, plaintiffs "[a]dmit[ted] that Interpal

11  did not identify any of the Relevant Transfers as being for any violent or terroristic

12  purpose."  (Plaintiffs' Rule 56.1 Response to Supplemental Statement ¶¶ 7, 8

13  (emphasis in Response).)

14     NatWest also quoted testimony and declarations from the managers of

15  its customer-relations, fraud-prevention, and anti-money-laundering groups stating

16  that the Bank was aware of Interpal's "*alleged*" links to Hamas (NatWest Rule 56.1

17  Supplemental Statement ¶ 16 (emphasis in Statement)), but that the Bank had no

18  tolerance for the funding of terrorism, did not want to be related in any way to such

1    activities, and would have taken quick action to terminate its relationship with

2    Interpal "if the bank believed that Interpal was funding terrorism" (*id*. ¶ 15; *see*, *e.g.*,

3    *id*. ¶¶ 14-19).  Plaintiffs' response to each of these NatWest assertions was to "[a]dmit"

4    that each cited speaker had so testified, but to add, by incorporation, their External

5    Appearance Caveat.

6            In addition, NatWest cited facts that plaintiffs had conceded in

7    responding to the Bank's First Summary Judgment Motion (made when the then-

8    operative *Weiss* action complaint alleged 15 terrorist attacks), including the following.

9        • Plaintiffs "admit[ted] they 'do not contend that any of the funds
10         Interpal transferred from the accounts it maintained with NatWest to
11         HAMAS was used specifically to finance any of the terrorist attacks that
12         injured Plaintiffs and/or killed their loved ones.'"  (First Summary
13         Judgment Rule 56.1 Statement and Response ¶ 248 (quoting Plaintiffs'
14         response to an interrogatory));

15       • Plaintiffs' expert Dr. Levitt "offers no evidence that any funds
16         transferred by Interpal through its NatWest accounts was used to
17         perpetrate the 15 attacks" (*id*. ¶ 253);

18       • Nor did Dr. Levitt "opine that any of the 12 Charities [that he
19         addressed] participated in" or "recruited" "any of the perpetrators of the
20         15 attacks"; he did not offer any opinion as to what individuals or
21         entities planned and executed the attacks at issue (*id*. ¶¶ 254, 261);

22       • Plaintiffs' expert "Spitzen does not opine that any of the
23         13 Charities requested that someone carry out any of the 15 attacks" (*id*.
24         ¶ 272).

1    C. *The District Court's Decision in* Weiss V

2              The district court concluded, in light of the decision in *Linde* and the

3    undisputed facts in the present actions, that the evidence adduced by plaintiffs was

4    insufficient to establish all of the elements necessary to hold NatWest liable under the

5    ATA either as a principal or as an aider and abetter.


6              1. *Liability as a Principal*

7              First, the district court addressed plaintiffs' claims seeking to hold

8    NatWest liable as a principal:

9              Plaintiffs bring their claims under 18 U.S.C. § 2339B as the
10             predicate criminal violation to satisfy the . . . require[ment] that
11             the [defendant's] act violate federal criminal law.  Section 2339B
12             makes it a felony to "knowingly provide[] material support or
13             resources to a [F]oreign [T]errorist [O]rganization," or attempting
14             or conspiring to do so.  18 U.S.C. § 2339B; *See also*, *Weiss [III]*, 768
15             F.3d at 207.  Under § 2339B, "a defendant may be liable for civil
16             remedies under § 2333(a) for providing material support to an
17             organization that solicits funds for an FTO," even if that support
18             is not provided directly to the FTO itself.  *Weiss [III]*, 768 F.3d
19             at 209.

20   *Weiss V*, 381 F.Supp.3d at 229.  The court noted, however, that

21             [i]n *Linde*, the Second Circuit rejected the argument that
22             providing material support to a known FTO in violation of
23             § 2339B *invariably* constitutes a violent act or act dangerous to
24             human life.  *Linde*, 882 F.3d at 326.  ("[T]he provision of material

-20-

> *support to a terrorist organization does not invariably equate to an act of international terrorism*. Specifically, . . . providing financial services to a known terrorist organization may afford material support to the organization even if the services *do not involve violence or endanger life and do not manifest the apparent intent required by § 2331(1)(B)*."). The Second Circuit explained that, "conduct that violates a material support statute can also satisfy the § 2331(1) definition requirements of international terrorism *in some circumstances*." *Id*. (emphasis added). However, the Second Circuit found that it was "incorrect [for the trial court in *Linde*] to instruct the jury that a finding that Arab Bank provided material support to Hamas in violation of § 2339(B) *was alone sufficient* to prove the bank's own commission of an act of international terrorism under § 2333(a)." *Id*. Instead, *the jury "needed to be instructed on and to find proved all of § 2331(1)'s definitional requirements for an act of international terrorism, including those pertaining to violence or danger and the apparent intent to intimidate or influence*." *Id*.

*Weiss V*, 381 F.Supp.3d at 229 (emphases ours, except as indicated); *see id*. at 230 ("Thus, the Second Circuit determined that the provision of material support to a terrorist organization alone is not enough to constitute international terrorism.").

The district court noted that in *Weiss II*, it had ruled on only one of the several grounds argued by NatWest for summary judgment. However, it then explained that:

> the ATA sets forth four separate requirements for an act to constitute international terrorism. *The act at issue must: (1) involve violence or endanger human life*; (2) violate federal or state criminal law if committed in the United States; *(3) appear intended to intimidate or coerce civilian population, influence government policy, or*

1        *affect government conduct by specified means*; and (4) occur primarily

2        outside the United States or transcend national boundaries. *See*,

3        *Licci [ex rel. Licci v. Lebanese Canadian Bank, SAL]*, 673 F.3d [50,] 68

4        [(2d Cir. 2012)].

5  *Weiss V*, 381 F.Supp.3d at 231 (emphases added).  Taking into account that in order

6  to prevail, plaintiffs were required to establish all four of those elements, the court

7  found merit in NatWest's contention that summary judgment dismissing the

8  complaints was required because plaintiffs had not adduced sufficient evidence to

9  prove the first and third elements, *i.e.*, to permit an inference that NatWest's conduct

10  involved violence or danger to human life or to permit an inference that its conduct

11  appeared to be intended to intimidate or coerce a civilian population, influence

12  government policy, or affect government conduct by statutorily prohibited means.

13      The court noted that "[i]n *Linde*, the evidence demonstrated that

14  defendant Arab Bank *processed bank transfers that 'were explicitly identified as payments*

15  *for suicide bombings*,'" *id*. at 235-36 (quoting *Linde*, 882 F.3d at 321 (emphasis ours)).

16  "Here," however, the court found that "Plaintiffs provide no such evidence," *Weiss V*,

17  381 F.Supp.3d at 236--*i.e.*, "[t]here is no evidence that the transfers Defendant

18  processed on behalf of the 13 charities were used explicitly for purposes similar to

19  those describe[d] in *Linde*," *id*. at 234.  Rather, the court noted that "Plaintiffs' experts

1    . . . admitted that the 13 Charities performed charitable work," *id*. at 232 (citing First

2    Summary Judgment Rule 56.1 Statement and Response), and that

3            *Plaintiffs concede that there is no evidence that any of Interpal's*
4    *transfers to the 13 Charities processed by Defendant were identified as*
5    *being for any specific violent or terroristic purpose*. . . . "Plaintiffs
6    admit they do not contend that any of the funds Interpal
7    transferred from the accounts it maintained with NatWest to
8    Hamas was used specifically to finance any of the terrorist attacks
9    that injured Plaintiffs and/or killed their loved ones." . . .
10   "[Plaintiffs a]dmit that Interpal did not identify any of the Relevant
11   *Transfers as being for any violent or terroristic purpose*."

12   *Weiss V*, 381 F.Supp.3d at 232 (quoting First Summary Judgment Rule 56.1 Response

13   ¶¶ 248 and 8 (emphases ours)).

14           The court thus concluded that NatWest's "motion for summary judgment

15   as to the violent acts and acts dangerous to human life prong of § 2331(1) is granted

16   because Plaintiffs fail to present evidence sufficient to create a jury question as to

17   whether Defendant's activities involved violent acts or acts dangerous to human life."

18   *Weiss V*, 381 F.Supp.3d at 235; *see id*. at 233 ("a reasonable juror cannot conclude that

19   Defendant's alleged conduct involves violence or endangers human life").

20           In addition, given that plaintiffs "adduce[d] no evidence" from which to

21   infer that NatWest "had the apparent intent to intimidate or coerce a civilian

22   population, influence the policy of a government by intimidation or coercion, or affect

1    the conduct of a government by mass destruction, assassination, or kidnapping," *id*.

2    at 236, the court concluded that NatWest's motion for summary judgment should be

3    granted for lack of a triable issue on the appearance-of-intent-to-intimidate-or-coerce

4    element of plaintiffs' ATA claim against the Bank as a principal.

5         2.  *Plaintiffs' Attempt To Raise Claims of Aiding and Abetting*

6         With respect to the matter of secondary liability under the ATA, the

7    district court faced the preliminary question of whether such claims were

8    procedurally foreclosed.  The original claims of aiding and abetting, based on

9    common-law principles, had been dismissed in *Weiss I* in 2006 for failure to state a

10   claim.  *See* 453 F.Supp.2d at 622.  In opposition to NatWest's 2018 Summary Judgment

11   Motion, plaintiffs argued that there was sufficient evidence to warrant a trial as to

12   whether NatWest aided and abetted the terrorist attacks, and they urged the court

13   either to allow them to further amend their complaints to state such claims under

14   JASTA or to construe the action as it stood to include such claims because they were

15   advocated by plaintiffs in the parties' July 2016 joint pretrial order ("Pretrial Order").

16   The court rejected plaintiffs' contention that they could pursue aiding-and-abetting

-24-

1    claims merely on the basis of their mention in the Pretrial Order.  *See Weiss V*, 381

2    F.Supp.3d at 237.

3         However, the court also rejected NatWest's contention that *Weiss I* had

4    precluded any future aiding-and-abetting claims.  The court determined that the mere

5    passage of time should not preclude plaintiffs' proposed amendment (a) because

6    plaintiffs could not have amended their pleading to assert JASTA aiding-and-abetting

7    claims prior to the filing of the Pretrial Order as that order was entered months before

8    JASTA was enacted, and (b) because Congress made JASTA retroactively applicable

9    in pending actions such as those here, with respect to an organization that had been

10   designated an FTO at the time it committed, planned, or authorized a terrorist attack.

11   *Id*. at 238.

12        Ultimately, however, the district court decided to deny leave to amend

13   the complaints to assert aiding-and-abetting claims under JASTA, holding that such

14   an amendment would be futile.  The court noted that while the mens rea element of

15   a § 2339B claim of providing material support can be satisfied by proof of the

16   defendant's "knowledge of the organization's connection to terrorism," a JASTA claim

17   of aiding and abetting has a different mens rea element, requiring proof that the

18   defendant be "'aware' that, by assisting the principal, it is itself assuming a 'role' in

1   terrorist activities.'"  *Id.* at 238-39 (quoting *Linde*, 882 F.3d at 329 (other internal

2   quotation marks omitted)).  Thus, while *Weiss III* established that there was sufficient

3   evidence in the present case to create a triable issue as to NatWest's mens rea on the

4   "material support" claim, the addition of an aiding-and-abetting claim would be futile

5   because plaintiffs had adduced

6           no evidence that creates a jury question as to whether Defendant
7           generally was aware that it played a role in any of Hamas's or
8           even Interpal's . . . violent or life-endangering activities.  Evidence
9           that Defendant knowingly provided banking services to a terrorist
10          organization, without more, is insufficient to satisfy JASTA's
11          scienter requirement.

12  *Id.* at 239.

13          Accordingly, final judgments were entered in the *Weiss* action and the

14  *Applebaum* action, dismissing the complaints in their entirety.  A joint notice of appeal

15  was filed in the two actions, challenging *Weiss V*'s grant of summary judgment and

16  denial of leave to amend the complaints.

17                                  II.  DISCUSSION

18          On appeal, plaintiffs contend principally that the district court (1) in

19  dismissing their claims to hold NatWest liable as a principal, erred by crediting

-26-

1    Interpal's "ostensibly charitable purposes" (Plaintiffs' brief on appeal at 43 (internal

2    quotation marks omitted)) and requiring evidence tracing the Bank's transactions for

3    Interpal to specific terrorist attacks; and (2) in denying their motion to amend the

4    complaints to assert claims against NatWest as an aider and abetter, erred by

5    applying an erroneous standard in assessing the evidence proffered as to the Bank's

6    general awareness that its services to Interpal were aiding and abetting terrorism by

7    Hamas.

8            NatWest has cross-appealed to request, in the event the judgments are

9    not to be affirmed, that we reverse the district court's denial of NatWest's motion to

10   dismiss the actions for lack of personal jurisdiction.  But it urges that "[g]iven the

11   number of years during which these cases have already been pending, this Court can

12   and should 'assume jurisdiction' and affirm on the . . . merits . . . as a means of

13   preventing waste of judicial resources." (NatWest brief on appeal at 62 (other internal

14   quotation marks omitted).)

15           When a cross-appeal is conditional, asking that it be "reached only if and

16   when the appellate court decides to reverse or modify the main judgment," and "the

17   direct appeal fails and the judgment is affirmed, the usual procedure is to dismiss the

18   cross-appeal as moot." *Trust for Certificate Holders of Merrill Lynch Mortgage Investors,*

-27-

1    *Inc. Mortgage Pass-Through Certificates, Series 1999-C1, ex rel. Orix Capital Markets, LLC*

2    *v. Love Funding Corp.*, 496 F.3d 171, 174 (2d Cir. 2007) (internal quotation marks

3    omitted).  We follow that procedure here.

4          For the reasons that follow, viewing the record in the light most

5    favorable to plaintiffs as the non-moving parties, *see, e.g., Longman v. Wachovia Bank,*

6    *N.A.*, 702 F.3d 148, 150 (2d Cir. 2012), we conclude that the district court did not err

7    in granting summary judgment or in denying plaintiffs' motion for leave to amend.

8    Accordingly, we affirm the judgments; and we dismiss the cross-appeal as moot.


9    A.  *Liability under the ATA as a Principal:  18 U.S.C. § 2333(a)*

10         The ATA (or the "Act") authorizes a private right of action by providing,

11   *inter alia*, that

12         [a]ny national of the United States *injured* in his or her person,
13         property, or business *by reason of an act of international terrorism*, or
14         his or her estate, survivors, or heirs, may sue therefor in any
15         appropriate district court of the United States and shall recover
16         threefold the damages he or she sustains and the cost of the suit,
17         including attorney's fees.

18   18 U.S.C. § 2333(a) (emphases added).   The Act defines acts of "international

19   terrorism" as follows:

20         As used in this chapter--

-28-

1           (1) the term "international terrorism" means activities that--

2               (A) *involve violent acts or acts dangerous to human life*
3           that are a violation of the criminal laws of the United States
4           or of any State, or that would be a criminal violation if
5           committed within the jurisdiction of the United States or of
6           any State;

7               (B) *appear to be intended*--

8                   (i) *to intimidate or coerce a civilian population*;

9                   (ii) *to influence the policy of a government by*
10                  *intimidation or coercion*; or

11                  (iii) to affect the conduct of a government by
12                  *mass destruction*, *assassination, or kidnapping*; ***and***

13              (C) occur primarily outside the territorial jurisdiction of the
14          United States, or transcend national boundaries in terms of the
15          means by which they are accomplished, the persons they appear
16          intended to intimidate or coerce, or the locale in which their
17          perpetrators operate or seek asylum . . . .

18      18 U.S.C. § 2331(1) (emphases added).

19          The Act also defines as crimes the homicide of a United States national

20      who is outside the United States, an attempt or conspiracy from outside the United

21      States to kill a United States national, and other "physical violence" by a person

22      outside the United States that either did or was intended to cause serious bodily

23      injury to a United States national.  *See* 18 U.S.C. §§ 2332(a), (b), and (c).  However, it

-29-

1    provides that there is to be no prosecution under § 2332 without a proper certification

2    that the "offense *was intended* to coerce, intimidate, or retaliate against a government

3    or a civilian population." *Id*. § 2332(d) (emphasis added).

4            The Act further makes it a crime to provide, or attempt or conspire to

5    provide, "material support or resources *to a foreign terrorist organization*," punishable

6    by a fine and/or up to 20 years' imprisonment, or up to life imprisonment if a death

7    has resulted.  18 U.S.C. § 2339B(a)(1) (emphasis added).  The term "material support

8    or resources" is defined to include "financial services."  *Id*. §§ 2339B(g)(4) and

9    2339A(b)(1).

10           Section 2339B(a)(1) also provides, *inter alia*, that "to violate" its

11   prohibition against providing "material support or resources to" an FTO, "*a person*

12   *must have knowledge* that *the organization is a designated terrorist organization* (as defined

13   in subsection (g)(6)), [or] that *the organization has engaged or engages in terrorist activity*

14   (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act[, 8 U.S.C.

15   § 1182(a)(3)(B)])."  18 U.S.C. § 2339B(a)(1) (emphases added).   The definitions

16   expressly referred to in § 2339B(a)(1) themselves import additional definitions from

17   other statutes.  *See id*. § 2339B(g)(6) ("the term 'terrorist organization' means an

18   organization designated as a terrorist organization under section 219 of the

1    Immigration and Nationality Act[, 8 U.S.C. § 1189]"); 8 U.S.C. § 1189(a) (such

2    designation is authorized with respect to "a foreign organization" that "engages in

3    terrorist activity (as defined in [8 U.S.C. §] 1182(a)(3)(B)[)] . . . or terrorism (as defined

4    in section 2656f(d)(2) of Title 22), or retains the capability and intent to engage in

5    terrorist activity or terrorism)" and whose "terrorist activity or terrorism . . . threatens

6    the security of" the United States or its nationals); *see also* 8 U.S.C. § 1182(a)(3)(B)(iii)

7    (defining "terrorist activity" to include criminal activity that "involves" "threatening

8    to kill" a person in order to coerce a government to do or refrain from doing an act);

9    22 U.S.C. § 2656f(d)(2) (defining "terrorism" to "mean[] premeditated, politically

10   motivated violence perpetrated against noncombatant targets by subnational groups

11   or clandestine agents").

12          Thus, as we have noted, if a defendant "provid[es] material support to

13   an organization that solicits funds for an FTO" in violation of § 2339B, the defendant,

14   "through this complex series of statutory incorporation--18 U.S.C. § 2333(a) to

15   18 U.S.C. § 2331(1) to 18 U.S.C. § 2339B(a)(1) to 8 U.S.C. § 1182(a)(3)(B)-- . . . *may be*

16   *liable for civil remedies under § 2333(a)*." *Weiss III*, 768 F.3d at 209.  Section § 2339B,

17   while making the provision of material support or resources to an FTO a crime, does

18   not itself provide a private right of action; the civil action is authorized by § 2333(a).

-31-

1    As *Linde* held, and as shown in the statutory language quoted above,

2    § 2333 allows a civil action by a person injured "by reason of an act of international

3    terrorism," 28 U.S.C. § 2333(a); that section specifies what elements must be proven

4    in order for the private plaintiff to recover; and the definitions provided, whether

5    spelled out in ATA § 2331 or imported from other statutes, inform the nature of those

6    elements. *See Linde*, 882 F.3d at 319-20.  Thus, given that the ATA allows a United

7    States national to recover for injury suffered "by reason of an act of international

8    terrorism," 18 U.S.C. § 2333(a), the definition of international terrorism in § 2331(1)

9    means that such a plaintiff must prove that the defendant's act not only violated

10   United States law or a State law (or would be a criminal violation if committed within

11   the United States or a State), but that the act "*also* involve[d] violence or endanger[ed]

12   human life," and "[f]urther . . . *appear[ed] to be intended* to intimidate or coerce a civilian

13   population or to influence or affect a government," *Linde*, 882 F.3d at 326 (citing

14   18 U.S.C. §§ 2331(1)(A) and (1)(B)) (first emphasis in original; second emphasis

15   added).

16   Whether a defendant "appear[ed]" to have intended its activities to

17   intimidate or coerce is not a question of the defendant's subjective intent but rather

18   a question of what its intent objectively appeared to be.  *See, e.g., Weiss III*, 768 F.3d

1    at 207 n.6.  Assessment of what an observer could reasonably find "*appear[ed] to be*

2    *intended*" depends on whether the consequences of the defendant's activities were

3    reasonably foreseeable, *see, e.g., Boim v. Holy Land Foundation for Relief & Development*,

4    549 F.3d 685, 693-94 (7th Cir. 2008), and reasonable foreseeability depends largely on

5    what the defendant knew, *see id*. ("A *knowing* donor" to an FTO--"that is *a donor who*

6    *knew*" the terroristic "aims and activities" directed at a particular territory--"would

7    *know* . . . that donations to" the entity would enable it to "kill more people in" the

8    territory.  "And *given such foreseeable consequences*, such donations would *appear to be*

9    *intended* . . . to intimidate or coerce a civilian population or to affect the conduct of a

10   government by . . . assassination, as required by section 2331(1) in order to distinguish

11   terrorist acts from other violent crimes." (internal quotation marks omitted)

12   (emphases ours)).

13            We see no merit in plaintiffs' contention that the district court found the

14   evidence as to whether NatWest appeared to intend intimidation or coercion

15   insufficient by "crediting Interpal's ostensibly charitable purposes" (Plaintiffs' brief on

16   appeal at 38 (internal quotation marks omitted)).  The court did not find that Interpal

17   in fact had only charitable purposes; rather, it observed that plaintiffs' own experts

18   said the 13 charities performed charitable work, and that plaintiffs admitted they had

-33-

1    no evidence that those charities had funded terrorist attacks or recruited persons to

2    carry out such attacks.  It also noted plaintiffs' admission that Interpal had not

3    identified any of the moneys it instructed NatWest to transfer to the charities as being

4    for any violent or terroristic purpose.  The absence of evidence to show that the

5    charities themselves were engaged in terrorism--or to show that the transfers were

6    designated for that purpose by Interpal--was material to an assessment of what a

7    rational juror could find NatWest knew.  Given that dearth of evidence, the court

8    concluded that a rational juror could not find that NatWest's processing of Interpal's

9    money transfers to the charities objectively exhibited the appearance that NatWest

10   intended to intimidate or coerce a population or a government.

11          Plaintiffs also contend that the district court misapplied the holdings of

12   *Linde*, arguing that "*Linde* held that where evidence establishes a knowing violation

13   of § 2339B that proximately causes injuries in terrorist attacks, *§ 2331(1)'s elements*

14   *must be submitted to the jury*."  (Plaintiffs' brief on appeal at 39 (emphasis added).)  We

15   disagree with plaintiffs' characterization of *Linde*, in part because it disregards the

16   procedural posture in which the case arrived in this Court and the substantive record

17   that had been developed in the district court.  The procedural issue before *Linde* was

18   not, as in the present case, whether summary judgment had been properly granted

-34-

1    against the plaintiffs for lack of proof as to certain § 2331(1) elements (on which they

2    had the burden of proof), but rather whether an instruction that resulted in judgment

3    in favor of the plaintiffs had improperly removed consideration of some of those

4    elements from the jury.  The jury had been instructed that if it found "that Arab Bank

5    provided material support to Hamas in violation of § 2339B," that finding "was alone

6    sufficient to prove the bank's own commission of an act of international terrorism

7    under 2333(a)"; that instruction was error, relieving the plaintiffs of their burden of

8    proving one of the elements of their claim.  *Linde*, 882 F.3d at 326.

9         And while *Linde* did indeed say that questions as to the satisfaction of the

10   § 2333(a) elements were to be resolved by the jury, we in no way intimated that the

11   existence of a genuine issue as to one element--whether § 2339B was violated--

12   requires a trial in a case where there is not sufficient evidence as to another element.

13   In stating that the § 2333(a) elements of whether the defendant Arab Bank's provision

14   of material support involved "violence or endanger[ed] life" and "manifest[ed] the

15   apparent intent required by § 2331(1)(B)" were issues to be submitted to the jury,

16   *Linde*, 882 F.3d at 326, we not only were dealing with the procedural posture of the

17   case as indicated above, but also were considering the record before us, in which there

18   was "evidence" that transfers were made to "purported charities *known* to funnel

-35-

1    money to Hamas," and that some of those transfers were "explicitly *identified as*

2    *payments for suicide bombings*," *id*. at 321 (emphases added).  A suicide bombing is an

3    act that inherently involves violence and objectively would appear intended to

4    intimidate a population or government.  The evidence in *Linde* thus sufficed to

5    present a triable issue as to whether Arab Bank had committed an act of international

6    terrorism by processing transfers that "involve" violence and that "appear" to intend

7    intimidation or coercion of a population or government.

8           The district court in the present case granted summary judgment to

9    NatWest because it found that plaintiffs had not presented any such evidence as to

10   the transfers made for Interpal by NatWest--or any other evidence that the transfers

11   by NatWest involved violence, or danger to human life, or had the appearance of

12   intending to intimidate or coerce a population or government.  Plaintiffs have not

13   called to our attention anything in the record to contradict that finding.

14          Plaintiffs' reliance on this Court's decision in *Weiss III*, vacating the

15   district court's prior grant of summary judgment, is misplaced.  On that appeal, we

16   ruled only on the issue of scienter, the sole element on which the district court in

17   *Weiss II* had granted summary judgment.  *See, e.g.*, *Linde*, 882 F.3d at 328 ("[I]n

18   *Weiss [III]* we addressed the 'scienter requirement' of the predicate material support

-36-

1  violation, not the definitional requirements of the ATA.").  The fact that *Weiss III*

2  concluded that there was sufficient evidence to present a genuine dispute as to that

3  element is of no moment here.  Where the undisputed facts reveal that there is an

4  absence of sufficient proof as to one essential element of a claim, any factual disputes

5  with respect to other elements of the claim become immaterial and cannot defeat a

6  motion for summary judgment.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

7  (1986).

8         In sum, the § 2333(a) principles announced in *Linde* were properly

9  applied in the present case:  In order for a plaintiff to prevail on an ATA claim against

10  a defendant as a principal, the elements listed in § 2333(a) must be proven; an element

11  is not proven unless the evidence comports with the ATA's definition of the element;

12  and proof of the provision of banking services, in and of itself, is insufficient either

13  to show that the services involved an act of violence or threat to human life or to give

14  the appearance that such services were intended to intimidate or coerce a civilian

15  population or government.

16         In order to establish NatWest's liability under the ATA as a principal,

17  plaintiffs were required to present evidence sufficient to support all of § 2331(1)'s

18  definitional requirements for an act of international terrorism.  We see no error in the

1    district court's conclusion that plaintiffs failed to proffer such evidence, and that

2    NatWest was entitled to summary judgment dismissing those claims.

3    B.  *The Denial of Leave To Amend To Allege Aiding and Abetting*

4            "We review a district court's denial of leave to amend for abuse of

5    discretion, unless the denial was based on an interpretation of law, such as futility,

6    in which case we review the legal conclusion *de novo*." *Panther Partners Inc. v. Ikanos*

7    *Communications, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).  Normally, a motion for leave

8    to amend is assessed on the basis of a plaintiff's proposed new pleading on its face;

9    however, where, as here, the request is made in response to a motion for summary

10   judgment, it is well within the court's discretion to consider the evidence in the

11   existing record in assessing whether the plaintiff's new allegations would, "as a matter

12   of law, . . . withstand [a] motion for summary judgment," *Milanese v. Rust-Oleum*

13   *Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (internal quotation marks omitted).  For the

14   reasons that follow, we affirm the district court's denial of plaintiffs' request to assert

15   JASTA claims of aiding and abetting.

16           JASTA was enacted in 2016, amending § 2333 by adding a new

17   subsection (d) to allow a person injured by an act of international terrorism to recover

-38-

1   from a person who aided and abetted or conspired in that act.  It provides, in relevant

2   part as follows:

3       (2) Liability.--*In an action under subsection (a) for an injury*
4       *arising from an act of international terrorism* committed, planned, or
5       authorized *by an organization that had been designated as a foreign*
6       *terrorist organization* under section 219 of the Immigration and
7       Nationality Act (8 U.S.C. 1189), as of the date on which such act of
8       international terrorism was committed, planned, or authorized,
9       *liability may be asserted as to any person who aids and abets, by*
10      *knowingly providing substantial assistance*, or who conspires with
11      the person who committed *such an act of international terrorism*.

12   18 U.S.C. § 2333(d)(2) (emphases added).  Congress gave JASTA a measure of

13   retroactivity by providing that such a secondary liability theory would be available

14   in any action pending on or commenced after its enactment, arising out of an injury

15   occurring on or after September 11, 2001, with respect to any organization responsible

16   for a terrorist attack if the organization had been designated an FTO at the time of its

17   commission, planning, or authorization of that attack.  *See id.*; JASTA, Pub. L. No.

18   114-222, § 7, 130 Stat. at 855 (Sept. 28, 2016) ("Effective Date").

19   Congress's stated purpose in enacting JASTA was "to provide civil

20   litigants with the broadest possible basis, consistent with the Constitution of the

21   United States, to seek relief against persons [and] entities . . . that have provided

22   material support . . . to foreign organizations or persons that engage in terrorist

1    activities against the United States," whether "directly or indirectly."  JASTA, Pub. L.

2    No. 114-222, § 2(b), 130 Stat. at 853 ("Purpose").  Under JASTA, therefore, a plaintiff

3    will "not have to prove that the [defendant's] own acts constitute[d] international

4    terrorism satisfying all the definitional requirements of § 2331(1)." *Linde*, 882 F.3d

5    at 328.

6            As to what a plaintiff will be required to prove, Congress, in its JASTA

7    "Findings," stated that the decision in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir.

8    1983) ("*Halberstam*"), "which has been widely recognized as the leading case regarding

9    Federal civil aiding and abetting and conspiracy liability, including by the Supreme

10   Court of the United States, provides the proper legal framework for how such liability

11   should function in the context of chapter 113B of title 18 United States Code [,

12   18 U.S.C. § 2331 *et seq.*]."  Pub. L. No. 114-222, § 2(a)(5), 130 Stat. at 852 ("Findings").

13   As set out in *Halberstam*,

14           [a]iding-abetting includes the following elements:  (1) the
15           party whom the defendant aids must perform a wrongful act that
16           causes an injury; (2) *the defendant must be generally aware of his role*
17           *as part of an overall illegal or tortious activity at the time that he*
18           *provides the assistance*; [and] (3) *the defendant must knowingly and*
19           *substantially assist the principal violation.*

20   705 F.2d at 477 ("*Halberstam* elements") (emphases added).  And as to "how much aid

21   is 'substantial aid,'" which may depend on "many variables," *id*. at 483, *Halberstam*,

-40-

1    after exploring caselaw, concluded that that element is appropriately evaluated in

2    terms of the following five factors suggested by the *Restatement (Second) of Torts* (1979)

3    ("*Restatement*"), to wit,

4    　　　　　[1] the nature of the act encouraged; [2] the amount [and kind] of
5    　　　　　assistance given; [3] the defendant's absence or presence at the
6    　　　　　time of the tort; [4] his relation to the tortious actor; [5] and the
7    　　　　　defendant's state of mind,

8    *Halberstam*, 705 F.2d at 483-84 (citing Restatement § 876(b), comment *d*), along with

9    a sixth factor, the "duration of the assistance provided," *Halberstam*, 705 F.2d at 484.

10    　　　　　The first *Halberstam* element itself has multiple parts.  The person the

11    defendant is alleged to have aided is the principal; the principal itself must have

12    performed a wrongful act; and the principal's act must have caused an injury.  *See*,

13    *e.g.*, *id*. at 478 ("[a]n aider-abettor is liable for damages caused by the main

14    perpetrator"); *id*. at 481 ("an aider-abettor is liable for injuries caused by the principal

15    tortfeasor").  For an ATA aiding-and-abetting claim, JASTA identifies the principal

16    as "an organization that had been designated as a foreign terrorist organization,"

17    18 U.S.C. § 2333(d)(2).  The aid the defendant provided need not be have been given

18    to the principal directly; as quoted above, Congress expressly so declared in its

19    statement of "Purpose" in enacting JASTA.  However, the second and third *Halberstam*

20    elements require proof that at the time the defendant (directly or indirectly) aided the

1    principal, the defendant was "generally aware" of the overall wrongful activity and

2    was "knowingly" assisting the principal violation.  *Halberstam*, 705 F.2d at 477.

3        In *Linde*, which had been tried before the enactment of JASTA, we

4    discussed the second *Halberstam* element in the course of considering whether the trial

5    court's instruction error (*see* Part II.A. above) could be considered harmless.  We

6    concluded that the error was not harmless in part because the mens rea element of

7    aiding and abetting is "different from the *mens rea* required to establish material

8    support in violation of 18 U.S.C. § 2339B, which requires" proof only of the

9    defendant's "knowledge of the organization's connection to terrorism." *Linde*, 882 F.3d

10   at 329-30; *see generally Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010)

11   ("Congress plainly spoke to the necessary mental state for a violation of § 2339B, and

12   it chose knowledge about the organization's connection to terrorism, *not specific intent*

13   *to further the organization's terrorist activities*." (emphasis added)).

14       In contrast to what is needed to show a violation of § 2339B, the second

15   *Halberstam* element of aiding and abetting requires a plaintiff to show the defendant's

16   "general[] aware[ness] of his role *as part of an overall illegal or tortious activity at the time*

17   *that he provides the assistance*."  *Linde*, 882 F.3d at 329 (emphasis added) (internal

18   quotation marks omitted).

-42-

1       [A]iding and abetting an *act* of international terrorism requires
2       more than the provision of material support to a designated
3       terrorist *organization*.  Aiding and abetting requires the secondary
4       actor to be "aware" that, by assisting the principal, it is itself
5       assuming a "role" in terrorist activities.  *Halberstam v. Welch*, 705
6       F.2d at 477.

7   *Id*. at 329 (emphases in original).

8       The issue of the mens rea requirements for a JASTA claim of aiding and

9   abetting acts of international terrorism was presented more directly in *Siegel v. HSBC*

10  *North America Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019) ("*Siegel*"), in which we

11  considered the district court's dismissal of such an action pursuant to Fed. R. Civ. P.

12  12(b)(6) for failure to state a claim.   The *Siegel* plaintiffs were victims, or

13  representatives of victims, of a series of terrorist attacks in Jordan on November 9,

14  2005.  They brought suit under JASTA against HSBC Bank USA, N.A. ("HSBC"), and

15  other defendants, alleging that HSBC had provided financial services to the defendant

16  Al Rajhi Bank (or "ARB"), a prominent Saudi bank.

17       The *Siegel* complaint included the following allegations:  that al-Qaeda

18  in Iraq ("AQI") was the terrorist organization responsible for the attacks; that ARB had

19  links to terrorist organizations including AQI; that HSBC was aware of ARB's links

20  to terrorist organizations; that ARB was, at all relevant times, involved in financing

21  terrorist activity; that the government of Saudi Arabia was monitoring ARB accounts

-43-

1    for links to terrorist organizations; that in 2003, the United States Central Intelligence

2    Agency referred to ARB as a conduit for terrorist transactions; that in 2004, the United

3    States government designated several Saudi-based non-profit organizations--all of

4    which were clients of ARB--as terrorist organizations; that HSBC internal

5    communications in 2002 and 2003 revealed that senior officers within the company

6    were concerned that ARB's account may have been used by terrorists, and that one

7    of ARB's clients had been linked to AQI; that despite HSBC's knowledge of ARB's

8    support of terrorist organizations, HSBC provided ARB with a wide range of banking

9    services, including wire transfers, foreign exchange, trade financing, and asset

10   management services; and that HSBC helped ARB to conceal the passage of billions

11   of U.S. dollars through the United States, and provided ARB with the means to

12   transfer millions of U.S. dollars to AQI which was actively engaged in planning and

13   perpetrating the murder and maiming of Americans, including the victims of the

14   November 2005 bombings in Jordan. *See Siegel*, 933 F.3d at 220-21.  ARB was an HSBC

15   customer for some 25 years, until January 2005 when HSBC decided to sever ties with

16   ARB due to its concerns about possible terrorist financing.  *See id*. at 221.

17           After other defendants had been dismissed for lack of personal

18   jurisdiction, the district court dismissed the complaint against HSBC for failure to

-44-

1    state a claim under JASTA.  This Court affirmed, "conclud[ing] that the plaintiffs'

2    aiding-and-abetting claim fail[ed] as a matter of law because the plaintiffs ha[d] not

3    plausibly alleged that HSBC assumed a role in the November 9 Attacks or provided

4    substantial assistance to AQI." *Id.* at 222.

5         We observed first that the *Siegel* plaintiffs "fail[ed] to advance any

6    plausible, factual, non-conclusory allegations that HSBC knew or intended that" the

7    funds they forwarded for ARB "would be sent to AQI or to any other terrorist

8    organizations"; we found that failure alone sufficient to "foreclose[] their JASTA

9    claim." *Id.* at 224-25.  In the absence of factual "allegations that would support a

10   conclusion that HSBC *knowingly* played a role in the terrorist activities," the plaintiffs'

11   allegations that HSBC "*was aware*," based on "public reports," that its banking

12   customer "*was believed by some* to have links to . . . terrorist organizations" "are

13   insufficient to state a claim for aiding-and-abetting liability under JASTA." *Id.* at 224

14   & n.6 (emphases added).

15        In addition, applying the six "factors" that *Linde* and *Halberstam* found

16   relevant to a determination as to what may constitute "'substantial assistance,'" we

17   noted that "[t]he plaintiffs have also failed adequately to plead the 'substantial

-45-

1    assistance' element of aiding-and-abetting liability under JASTA."  *Siegel*, 933 F.3d

2    at 225.  We stated, *inter alia*, that

3          plaintiffs here have not plausibly alleged that HSBC encouraged
4    the heinous November 9 Attacks or provided any funds to AQI.
5    To be sure, the plaintiffs did allege that HSBC provided hundreds
6    of millions of dollars to ARB, but *they did not advance any non-*
7    *conclusory allegation that AQI received any of those funds or that HSBC*
8    *knew or intended that AQI would receive the funds*. . . .  Similarly, on
9    the fifth factor--defendant's state of mind--the *plaintiffs do not*
10   *plausibly allege that HSBC knowingly assumed a role in AQI's terrorist*
11   *activities or otherwise knowingly or intentionally supported AQI*.

12   *Id*. (emphases added).  We concluded that

13         [t]aken as true and viewed in the light most favorable to the
14   plaintiffs, the allegations establish, at most, that, up until January
15   2005, HSBC helped ARB violate banking regulations despite
16   knowing that ARB supported terrorist organizations.  *Even were*
17   *that proven, however, it would be an insufficient basis for liability under*
18   *JASTA because the plaintiffs have failed to allege that HSBC knowingly*
19   assumed a role *in AQI's terrorist activities or substantially assisted*
20   *AQI in those activities, specifically the November 9 Attacks*.  We
21   therefore conclude that the plaintiffs' aiding-and-abetting claim
22   fails.

23   *Id*. at 225-26 (emphases added).

24         Thus, in the present case, plaintiffs' argument that the relevant JASTA

25   mens rea element--*i.e.*, whether NatWest was generally aware it was providing

26   material assistance to Hamas--was established by evidence that NatWest was

27   assisting Interpal is contrary to *Linde* and foreclosed by *Siegel*.

-46-

1    　　　　The district court appropriately assessed plaintiffs' request to add JASTA

2    claims, given the undisputed evidence adduced, in connection with the summary

3    judgment motions, as to the state of NatWest's knowledge.  As discussed in Part II.A.

4    above, the record included evidence that plaintiffs' experts said the charities to which

5    NatWest transferred funds as instructed by Interpal performed charitable work and

6    that, as plaintiffs admitted, Interpal did not indicate to NatWest that the transfers

7    were for any terroristic purpose; and plaintiffs proffered no evidence that the charities

8    funded terrorist attacks or recruited persons to carry out such attacks.  On this record,

9    the district court did not err in denying leave to amend the complaints as futile on the

10   ground that plaintiffs could not show that NatWest was knowingly providing

11   substantial assistance to Hamas, or that NatWest was generally aware that it was

12   playing a role in Hamas's acts of terrorism.


13   　　　　　　　　　　　　　　　CONCLUSION


14   　　　　We have considered all of plaintiffs' arguments on this appeal and have

15   found them to be without merit.   The judgments are affirmed.   Defendant's

16   conditional cross-appeal is dismissed as moot.